You can, well they're still clearing out in the back so you can hold what you got for just a second. He'll be right back. We're not, we're not rushed. A lot of paper up here. So let's see, looks like y'all contributed. Somebody on your side has contributed to our... I'm guilty, your honor. Desire for more paper. I thought we were in a paperless... Then I knew before, let's put it that way, your honor. Go out and find that Texas Crown. I'm not saying a lot. Go find that Texas Crown and compare those bags and so forth. All right, you're good to go. Thank you, Chief Judge Stewart. May it please the court. This case is about a three-member money management firm that managed millions of dollars, that made millions of dollars, and made all of its decisions, important decisions, with a nod, a handshake, a one-line email. The only comprehensive writing in this case is the 2009 operating agreement. And for our purposes, for the appeal, it's got three provisions that matter. Broad arbitration clause that says all disputes by these members have to be arbitrated. They shall not be resolved in any other form other than an arbitration. It's got a paragraph 20 as an entire agreement clause that says any proceeding negotiation agreement contract with these parties is superseded by the operating agreement. And third, it's got a provision under 4.9C that says these three members, Mr. Cooper, Mr. Ozag, Mr. Bolton, can only be expelled for cause. They can't be expelled other than for cause, and it defines what cause is. Now in that context, I'd like to discuss two of the issues that we've raised. Raised judicata, and in particular, the same transaction or occurrence element, which is the only element the district court found absent, and the million dollar arbitral award to Mr. Ozag, which is not based on the operating agreement even arguably. Now raised judicata and the transaction or occurrence, the test there, and has been in this court since at least 1979, the Plant v. Blazer Financial Services case, is the logical relationship test, and it's the same test for a compulsory counterclaim. If that's under 13A, if that's met, then it's the same transaction or occurrence. There are four factors in that, whether the issues of fact and law are largely the same, whether raised judicata would bar a subsequent suit by the defendant in the first filed suit, and the first filed suit in this case is the Louisiana State Court suit by West End against Mr. Cooper. The third factor is whether substantially the same evidence will support the plaintiff's claim, as well as the defendant's counterclaim or defenses. And the fourth element is the logical relationship between the two claims and the two different suits, whether they're related by time, origin, motivation, and whatnot. As to the first claim, whether the issues in fact are the same, they are the same. West End's suit against Cooper in state court was all dependent upon cause to expel Cooper from West End. He couldn't have been expelled without cause, so to say he's expelled is to say that he had cause to expel him, and that's all the allegations they later made in arbitration. Breach of fiduciary... May I ask you... Yes, Your Honor. ...a practical question. Arbitration agreement, a valid agreement as far as the parties are concerned. The party thinks a TRO would be necessary. Is there any way to initiate arbitration to get a TRO? Absolutely there is. Well, you've got to find the arbitrators. You've got to go through the whole drill, or however long that takes. It seems, practically speaking, if it's a TRO matter, something in which an immediate turnaround is needed, the arbitration is completely inadequate. Well, the arbitration... The remedy might be available to enjoin something. It's something else to say that if you're looking at a temporary restraining order to stop immediately some sort of conduct, that arbitration is a suitable mechanism. You've got a hard sell to me, which doesn't mean you're wrong on the overall issue, but it does put a special light on why a TRO was pursued here without potentially waiving arbitration. Well, waiver is probably our weaker argument rather than res judicata, but in terms of a TRO and what's available in arbitration, arbitration is first and foremost a creature of contract, and the contract in this case, in the arbitration provision, says everything gets arbitrated. It doesn't matter. Arbitrators have been selected at the time of the TRO? I'm sorry, Your Honor, I didn't hear the... Arbitrators have been selected at the time of the TRO? No, the arbitration hadn't even been initiated. I'm saying so. The arbitrators have not been selected. The whole process... It was a factual question. I don't need to go further with it. Keep going. Well, the thing is, whose fault is that? West End is the one who wanted to pursue claims against Mr. Cooper. The JAMS rules allow an arbitrator to issue injunctive relief. It's Rule 24E. It's found in the record at page 208, and it says the arbitrator can issue an injunction. So when you have a contract that says everything's got to be arbitrated, he has to issue an injunction. A curious aspect of that rule is it also says if you go to court for an injunction, that's not going to be deemed a waiver of arbitration under the JAMS rules, I think, words to that effect. That doesn't nullify the party's contract. In this case, it says absolutely everything has to be arbitrated, and it certainly doesn't trump Louisiana law that says if you go to court and bring certain claims that arise out of the same transaction or occurrence, you need to bring them all, or they're going to be lost if there's some kind of a judicial determination. Again, the judicial determination in this case was the dismissal with prejudice. That was entirely within West End's control. If they dismissed their state court suit without prejudice, I wouldn't be making any of these arguments. There wouldn't be an argument to be made. They're the ones who determined to do that. When they decided to dismiss it with prejudice, that was a termination in Mr. Cooper's favor. That was the end of all the claims that were made. And the transaction or occurrence, first and foremost, is breach of the operating agreement. And that was supposedly one of the elements of cause to get rid of Mr. Cooper, to kick Mr. Cooper out. And that's the basis for the relief that they're seeking. Don't come to the office. Don't contact clients. Don't contact the accountant. That's what they got in the TRO. And, Judge Southwick, I think you raise an issue that the district court kind of got caught up in was, well, they got the TRO. This is this emergency relief that they needed to get, and that's sort of the end of the story. Well, yes, they got the TRO, but the suit was about a TRO, a preliminary injunction, and a permanent injunction. For a state court in Louisiana to tell Cooper, you can never talk to the accountant. You can never talk to these clients. You can never come anywhere near any of these people forever, until further order of the court. So the TRO is what they got. The object of the suit was to bar all of that conduct. And since 1990 in Louisiana, even that is insufficient, because we're talking about, what's the transaction or occurrence? What's the evidence going to be? If we were going to have a ruling, the preliminary injunction hearing that was set for September 14th of 2012, and then West End decided, well, we're going to decide to go arbitrate now. We're not going to go forward with that. The evidence on that would be Mr. Cooper coming to court to say, I wasn't lawfully kicked out of the firm, as you allege. You didn't have cause. We'd have a whole trial over cause. It would be the same evidence we had in this case. They talk about making charges to the firm, Amex. We had a lot of, that was a big part of the arbitration. The evidence was, everybody's making these charges, and they all get reconciled when it comes tax time between what's personal and what's not. But that's one of the allegations that he breached the operating agreement in state court. That's going to be some of the testimony we'd hear about in a state court proceeding. That's powerful proof that we're talking about the same transaction or occurrence. He was kicked out with cause. If he wasn't kicked out with cause, why can't he go to the office? Why can't he contact the accountant? Any one of the factors that this Court has adopted for the same transaction or occurrence is sufficient to say it's the same. You don't have to hit all of them, any one of them. The logical relationship, is it And that's all present in this case. And I think what the district court did, is it sort of implicitly looked at the old Louisiana law, the pre-1990 law, and said, what's the object of the suit? And said, well, the language in the lawsuit in state court was just background about the expulsion and having cause, and it was really just for this temporary injunctive relief. That's looking at the object of the suit. That's looking at the cause of action. That's not looking at what is interpreted broadly in res judicata. Is it the same transaction or occurrence? The same group of facts or not? And even, but even looking at that, even saying, well, let's look at the object of the suit. The TRO suit, or the suit that got the TRO, they wanted a preliminary and permanent injunction in the same form as the temporary restraining order, which said, don't talk to clients, don't talk to the accountant ever, forever. We want to be, want you to be permanently barred from doing that. Well, if you look at the claim in arbitration, page two of the statement of claim, which is record number 732, paragraphs nine, 10, 11, 12, all of this, all of these are accounting issues. The accountant testified in the arbitration. The accountant would have testified in the state court proceeding to talk about, did this really happen? Were these, did he really do what we claimed that he did? We want an accounting of all this. That's the other thing. Even under the old Louisiana law, the relief requested in the statement of claim, record number 738, the very first type of relief is, in order for an accounting to calculate the value of Mr. Cooper's capital account, in addition, claimant requests an order from Mr. Cooper to provide documents and information needed to complete the accounting. Well, even just the object of their state court suit was, prohibit Mr. Cooper from having contact with plaintiff's clients and accountants. Don't let him access the firm files. Then they turn around and say, well, we want an accounting from you. It implicates the same issues. It implicates the same kind of evidence. It looks at all of these same things. Number two of the relief request is, again, an accounting. They want documents from Mr. Cooper. The same documents they want the state court to say, Mr. Cooper should be permanently denied access to any of these documents. That's the flip side of the Miller-Bruin case on the waiver issue. The party in that case who went to court was able to get a bunch of discovery in court that it wouldn't have gotten in the arbitration. In this case, Mr. Cooper was denied just the ordinary discovery, access to his accountant, which was also West End's accountant, access to his clients, access to his own files, the West End server. So he was denied the discovery that he would just have as a matter of course as a member of this firm who has access to the office and goes into the office. Is there a difference between a TRO that wants him out of the office and an arbitration that settles the breaking up of the corporation, organization, whatever, and how much money goes to each one? One deals with damages in the final division. The other one is, we need him out immediately because it's causing problems. I mean, is there a distinction there between the TRO that says, we just need him out right now, there's all sorts of problems with him coming into the office, and we can arbitrate later the breakup of the organization? There is no distinction in this case, Your Honor, because he can only be kicked out of the firm for cause, and cause is defined. If he could be kicked out for something other than cause, or if he were an Atwill employee and there were some other ancillary claims related to that employment, that would be one thing. That would say, hey, we fired this guy. This is an Atwill state. He's gone. Now he's coming to the office. We want him to stay away from the office. That's not the case here. You have somebody who can only be expelled for cause. So to say he's kicked out, to say he's expelled from the firm, and to say he had cause to do that, and this is what the cause is, it's the same thing. It has to be the same thing. That's the party's contract in this case. And again, the TRO is what they got just as a matter of course, what they wanted with the object of the suit, which is even the old law, is don't ever let this man talk to the accountant. Don't ever let him access clients, even though one of the claims is he's got this agreement with a client. It turned out that was all that was in violation of the operating agreement, they said. That was all false. That was never supported. All the allegations about going to the office and harassing and stalking people, that was all false. We had a month of 24-hour surveillance. So just on the equitable aspect of it, we know those claims are false anyway. But the fact of the matter is, to say somebody can't come to the office is to say he's not a member. And in this case, to say he's not a member is to say there was cause to kick him out. It's the same thing. On the Ozag claim, the claim for hedge fund management fees to Gus Ozag for a million dollars, that's not based on anything at all. That's based on one of the things I submitted was a 2007, according to Mr. Ozag, it's based on a 2007 agreement, Record Document 1319 and 1320, that talks about, well, from time to time, Mr. Cooper is going to see that Mr. Ozag gets 40 percent of these hedge fund management fees. It's at Mr. Cooper's discretion. It's based on his knowledge of the company and things of that nature. Mr. Ozag did participate in those fees for several years until he ceased to be a salesman for the hedge fund because the hedge fund was closed to new members. And when he moved to Chile, and there was nothing more for him to do. More importantly, after all this, after this agreement was written, the one that Mr. Ozag hung his hat on to say he needs a million dollars, the operating agreement was entered into in 2009. In paragraph 20 of that agreement says it supersedes all prior agreements. That's the only one that's got an arbitration clause. There is no agreement anywhere in the record that allows Mr. Cooper, Mr. Ozag to get an arbitral award of a million dollars based on these fees. And that's not a question of the arbitrators improperly interpreting the operating agreement or not doing a good job or doing an arguable correct or incorrect job. That's not in that operating agreement at all. And I think West End has never addressed that. They rely on the presumption in favor of arbitral awards, and certainly there's a strong legal presumption that we're up against in this case. But when an arbitrator is not interpreting the contract at all, as opposed to just interpreting it wrong or arguably incorrectly, there's nothing justifying that reward. I think West End should say whether in the operating agreement that is. Where is that found in that 33-page agreement that Mr. Ozag gets any hedge fund management fee? Mr. Bolton, the other member, never even claimed it. I see I'm out of time, Your Honors. Thank you, Mr. Laughlin. All right, we're here from West End Capital. Mr. Labidus. Thank you, Your Honors. May it please the Court, Kerry Lapidus for all of the appellees. I'll address the race judicata issue first. Race judicata acts as a bar to the plaintiff raising the same claim between the parties in a subsequent case, but the two cases must arise out of the same transaction or occurrence that was the subject matter of the case. And these two cases were the TRO case involved Mr. Cooper's post-expulsion conduct only, and the arbitration proceeding involved Mr. Cooper's pre-expulsion misconduct only. There were no claims for damages in the TRO case, and Mr. Cooper has the burden of proof on this issue, and he did not meet it in the district court. How do you address his response? Well, they told him on one hand, stay away from the accountants and don't get these documents, and on the other hand, in the arbitration, they said we need this information from you, which would require him to have contact with the accountants or whoever. Was there a conflict between what was being requested as far as the transactions were concerned? No, I don't believe so. The main object of the TRO was to protect West End's employees from a threat of danger from Mr. Cooper. As it was alleged in the TRO application, as you will see, Mr. Cooper engaged in threats by threatening texts, threatening emails. He tried to enter the premises after he was expelled, and the security people had to prevent him from doing so. And one of the things that was requested was that he not interfere with West End's business, and one of the things related to that was contacting the accountants or the clients. But the TRO was intended only for a limited period of time. It wasn't intended to cover the arbitration proceeding, which had not yet been filed. I think it's important to note also that the arbitration proceeding was filed before the TRO action was dismissed, about a month before the TRO action was dismissed. So it was never contemplated that the TRO action would be the only action, that there would be no arbitration. So the res judicata effect of the TRO dismissal should not take place in this case. So when was the decision to terminate for cause made? I mean, the arbitration was still going on, so he was fired and let go, but arbitration had not yet made a determination that there was cause for the termination. But there were three members of this limited liability company. Two of the members voted to expel Mr. Cooper with cause, and that expulsion took place on August 3, 2012. Then, I believe on August 24 or thereabouts, 2012, the application for the TRO was filed. And then in September, late September, September 26 or 27, 2012, the arbitration proceeding was dismissed. The TRO was dismissed by motion of West End, and it was dismissed with prejudice. Mr. Cooper never appeared in the TRO action. He never made an appearance. He didn't do anything. He didn't incur any expense. There was no discovery. And the TRO action, in fact, did not have to be dismissed with prejudice. I believe it was an error on the part of West End's counsel at that time to dismiss it with prejudice. It could have been easily dismissed without prejudice, or the TRO would have expired on its own accord as of September 14, 2012. So I don't believe there was any conflict. Once the TRO expired, Mr. Cooper was freed to contact the accountants and get the documents that he needed or said that he needed. The argument, as I understood it from opposing counsel, is that you could not resolve TRO preliminary injunction and injunction, depending on how long it went, without deciding what Mr. Cooper's rights were to be in premises and to be talking to an accountant and whatever else, which all goes to whether there's any cause for him to be evicted from the premises and for this arbitration to be commenced. What's your take on that? Were you necessarily having to resolve on TRO whether, in fact, there was cause for Cooper to leave? And if not, how was the judge making a decision of whether Cooper was within his rights? You're talking about threats. I heard from Mr. Cooper there were no actual, I don't guess Mr. Cooper's here, maybe he is, but his counsel, there were no actual threats and so some factual differences there. So to what extent, and if we looked at the record of TRO, would we see any investigation into whether Mr. Cooper had violated the terms of their operating agreement? I don't believe you would see that. There was no allegation that that was a necessary component for requesting the TRO. The TRO, in essence, was necessary to protect the West End employees from threats from Mr. Cooper. But there was raised in those proceedings the allegations, the claims that Mr. Cooper had violated the operating agreement. That was just background information. Yes. As the district court said, that was just background information to give context to this situation. It wasn't the basis for the TRO. And Mr. Cooper was expelled by vote of the members of the limited liability company. That was sufficient to establish that he had been expelled from the company. Whether his expulsion was proper or improper was for the arbitrator to decide and not for the judge in the TRO case to decide. So even if the res judicata principle applied in this case, it would not apply to Mr. Ozag or Mr. Bolton's claims. West End Capital Management was the only party to the TRO action. Mr. Bolton and Mr. Ozag were not parties to that action. So the res judicata doctrine would not apply to them. And they had separate and distinct claims against Mr. Cooper, separate from those of West End Capital Management. They sought damages for injuries that were direct to themselves and were not I will move on to the issue about Mr. Ozag's award, unless the panel has questions about the res judicata issue or any other issue. The issue about Mr. Ozag's award, as it was framed in Appellant's brief, was an issue about arbitrability. The argument was that the arbitrator didn't have the authority to decide Mr. Ozag's arbitration provision in the two-page contract that Mr. Laughlin referenced between Mr. Ozag and Mr. Cooper, which provided that Mr. Ozag would receive these fees. And the issue about arbitrability, who decides arbitrability, depends upon the wording of the arbitration provision. And where there's a very broad arbitration provision, the courts have held that it is for the arbitrator to decide arbitrability. And in this case, as Mr. Laughlin admits, we have a very broad arbitration provision. It states that it will apply to any dispute arising out or relating to the agreements, the company, or its business or management. It's hard to imagine a broader arbitration provision. And the dispute between the parties about the West End hedge fund fees that we're talking about Mr. Ozag's claims here, relates to the company and its business and its management. If you look at the two-page contract, it states many times that the hedge fund is a part of the West End capital business and the hedge fund fees are part of that business also in the flow of the income. In addition to this, the parties agreed that JAMS rules would apply in this case. Mr. Cooper agreed to be bound by JAMS rules. And so the arbitrator decided all claims, including Mr. Ozag's claims, was arbitrable. And this court, the district court, properly deferred to the arbitrator's rulings and so should this court. In addition to this, Mr. Cooper waived his right to object to arbitrability. He did not raise an objection on this issue until after the arbitration award had been issued. And in the first time that he raised it, in fact, was in his reply brief to the motion to vacate the arbitration award. This is way late. It's a clear waiver of this argument. I'd also like to point out with respect to both the race judicata and the waiver issue that Mr. Cooper waived his right to raise this issue before this court. And this court, in fact, has no jurisdiction to decide this issue. Mr. Cooper raised the race judicata and the waiver issues in a complaint for declaratory relief in the district court. He argued in that that arbitration should not go forward because of the race judicata issue and because of the waiver issue based on this TRO action. And the court found against Mr. Cooper and denied that, issued an order. And under the Federal Rules of Appellate Procedure and the Federal Arbitration Act, Section 16A.3 of the Federal Arbitration Act says that appeal has to be taken from a final decision with respect to arbitration. And Federal Rule of Appellate Procedure 4A.1 and 4A.7a small 2 states that that appeal has to be taken within a certain time period. And that time period, under Federal Rule 4A.7a small 2, is 180 days after the order was issued. It's 180 days because there was no final judgment that was issued with respect to that. So he gets 180 days rather than just 30 days. But no appeal was taken within that 180 days. And therefore, as a matter of law, this court does not have the jurisdiction to decide that the race judicata or the waiver issue applies in this case. There are other issues in this case. Mr. Laughlin didn't raise them. I don't know if he's abandoning them, but I'm happy to address them here unless the court has questions about any of the things we've discussed so far or otherwise. You know, many of the comments by Mr. Laughlin are that the judge in this case, the arbitrator in this case, Judge Cahill, misapplied the law and that he applied the law incorrectly to the facts that were presented to him. Well, it's black letter law that a court may not overturn an arbitrator's award based on error in either understanding the facts or applying this law. And this court would have to substitute its record of the arbitration proceeding, which you do not have. Even if the arbitrator was incorrect and the court had the power to overturn the arbitrator's decision, there were other grounds upon which the arbitrator could have found in favor of Mr. Ozag or Mr. Bolton or West End. And none of those determinations can be overturned in this case. They also raised in their brief the issue about arbitrator disclosure. One of the important things to understand in this respect is that Mr. Cooper has the burden of proof to show that the Section 1282A.6 of the California Code of Civil Procedure. And essentially, as I understand it, an appellant's argument is that an alternative dispute resolution provider, such as JAMS, has a duty to disclose a relationship between a mediator or an arbitrator on its roster who was not the arbitrator in the case and one of the parties. And this position has no support in any statute or case law. Appellant's argument is flawed with respect to this disclosure issue because he does not challenge the conduct of the arbitrator who presided over the case, nor any disclosure by that arbitrator as it relates to the party. And the California statute and the California ethical standards that were cited by appellant apply only to the arbitrator who is deciding the case and not to a person who is not the arbitrator and not to the alternative dispute resolution provider, which in this case was JAMS. The California statute and the ethical standards in California contain a long laundry list of items that need to be disclosed. And nowhere on those lists is a requirement that the arbitrator needs to disclose a relationship between another person on the ADR provider's roster and one of the parties. And even if that was the case, even if that was required, the relationship between Mr. Bolton and this non-arbitrator, Mr. John Bates, that they challenged, was so tenuous that such disclosure would not have been required under either California or federal law. There was no close or substantial relationship between Mr. Bates and Mr. Bolton. Mr. Bates had served as a mediator in a case involving Mr. Bolton ten years before the arbitration proceeding. They were members of the same large club in California, and that's it. They had never spoken about the case against Mr. Cooper and, in fact, had not spoken with each other in ten years. And this is all in the record. And California law and federal law routinely holds that personal acquaintances are not disqualifying for an arbitrator, and neither is membership in the same professional organization or social club. The arbitrator in this case, Judge Cahill, knew nothing about the supposed relationship between Mr. Bates and Mr. Bolton until it was raised by Mr. Cooper's counsel at the arbitration hearings. And the law in California, by the way, is that arbitrators are only required to make disclosures about what they are aware of, and Judge Cahill was not aware of this relationship between Mr. Bates and Mr. Bolton. And he stated that on the record in the hearing, that he had not spoken to Mr. Bates about the case and that Mr. Bates was not even aware that Judge Cahill was conducting the hearing in the case. Even if there had been a substantial relationship between Mr. Bolton and Mr. Bates or there was any other reason why Judge Cahill should have been disqualified as the arbitrator, Mr. Cooper waived his right to challenge the award on this ground because he failed to follow Jams' rules, which required a written challenge to the arbitrator. And those are Jams' rules 15I and 27B. And even if there wasn't the Jams' rules, California statutes require that there be a timely, that the party make a timely demand to the arbitrator to disqualify himself under the California statute, and that's California Civil Code section 1286.2a6. And Mr. Cooper did not follow the Jams', nor did he make a timely demand for the arbitrator to disqualify himself. So Mr. Cooper has not met his burden. Even if he had met his burden, he's waived it many times. And I think the final thing to consider here is the public policy implications of Mr. Cooper's argument. If his standard was adopted, arbitrations would likely grind to a halt, at least for the large ADR providers such as the American Arbitration Association, Jams, or FINRA. It would be extremely burdensome for any of these large ADR providers who have hundreds and sometimes thousands of arbitrators and mediators to check with each person on their roster who is not an arbitrator for the case to determine whether there is any relationship between a party and one of these parties. To address the waiver issue, which Mr. Laughlin admitted was one of their weaker arguments, there's a strong presumption against waiver of the right to arbitrate. Waiver will only be found where there is detriment or prejudice to a party, and prejudice, the courts have held, means delay, expense, or damage to a party's position. The factors that are reviewed are did discovery occur, what is the time and expense of defending the case, and was there a timely assertion of the right to arbitrate. And all of these factors are in favor of West End. There was no discovery in this case. Mr. Cooper, in fact, didn't even appear in the case, and because he didn't appear, he didn't incur any time or expense defending the case. There was a timely assertion of the right to arbitrate. West End filed its arbitration demand within four or five weeks after the TRO case was filed. And so, therefore, Mr. Cooper has not met his burden, and this court should not find that there was any waiver. I see that I'm out of time. All right. Thank you, sir. Mr. Laughlin, you are about time. Thank you, Your Honor. On the waiver issue and appellate jurisdiction issue, Section 16A of the FAA would be important if there wasn't a Section 16B. And 16A is all about when an interlocutory appeal can be taken from certain decisions made in a case involving the FAA, the Federal Arbitration Act. Sections 15B says when they can't be taken, when there's a stay of an action under Section 3 of this title. Judge Englehart sua sponte issued a stay where the courts refused to adjoin an arbitration that is subject to this title, where the court has compelled arbitration under the title. You can't take an appeal from that. But even then, the context is, when can you take an interlocutory appeal without the niceties and the requirements of 1292B, without getting it certified, without it getting permission to take the appeal? This happens all the time in qualified immunity cases, where a police officer, someone says he's got qualified immunity, the court denies a summary judgment. He doesn't need permission to appeal that. He can appeal that immediately. He can take an appeal on that. But he doesn't have to. He can wait until all is said and done and there's a final judgment, just like any other case. That's what we did in this case. We're not required to take an interlocutory appeal. We weren't even allowed to under Section 16B, and we chose not to. We waited until there was a final judgment, like a typical case. The Orr case, the Fifth Circuit case cited in the appellate brief is to the same effect. That's the question about an interlocutory – is there an interlocutory – does the court have jurisdiction to hear that appeal even though there's not a final judgment? And the court said yes, because it's under 16A. But the alternative is not going to be that the appeal is lost. The alternative is, well, you've got to wait until there's a final judgment. On res judicata again, everything Mr. Lapita said talked about the same claim, post-expulsion conduct. That's contrary to what they said in the suit when they wouldn't pay the investigators. They said, oh, we fired Cooper because he's been harassing employees. That was one of the reasons they fired him. It's not a claim for damages in the TRO suit. That was a great argument before 1990. It's a bad argument now. The object of the suit is irrelevant. The intent of the TRO, that's irrelevant. The threats, and he tried to enter the premises. Well, we know factually that's false, because he's under 24-hour surveillance, and those people said nothing happened. But even then, he can't go to the office. The question is, why can't he go to the office? West End says, because he's expelled from this firm. He's not a member in good standing, because we had cause to expel him. The issue that's going to be raised is going to be, that's not true. If you get evicted from your apartment because you didn't pay rent, and your defense is, yeah, I paid rent. Here are the canceled checks. Well, the eviction gets overturned. That's the central issue in that case. That's the central issue in the TRO suit. I kind of regret calling it a TRO suit. It's an abbreviation. It's easy to say that, rather than everything else. The TRO is what they got. The TRO is one of the things they asked for. They wanted a preliminary injunction. They wanted a permanent injunction, and they wanted the same kind of relief that dovetails exactly with their claim in jams. We want an accounting. We want documents. In the earlier suit, they said, you can't talk to the accountant. You can't access documents. Even under the old law, that would be res judicata. But there's no waiver, and the transaction or occurrence, it's almost incredible to say these are two totally different issues. It's all about whether they had cause to kick Cooper out of the firm. The facts of the case were they decided to expel Cooper and come up with the reason later. And Mr. Lapidus said, well, it was an error to dismiss it with prejudice. It may well have been an error, and the error is highlighted by the fact that it compromised their entire claim, and every other claim they had were rising out of the same transaction or occurrence. The operating agreement, the alleged breach of the operating agreement. These claims were not waived. We've had these claims constantly. If that was an error, it's West End's error, and Mr. Cooper should not be prejudiced by that. In terms of Mr. Ozag and arbitrability, the thing is like with the jams rules. Sometimes West End relies on the jams rules. Sometimes they ignore the jams rules. In terms of disclosure, for instance, and the ethical issues that we briefed. But the he says a 2007 agreement gives him a right to a million dollars. It's a written agreement. It talks about discretion on the part of Cooper. It doesn't have to pay anything. It doesn't have an arbitration provision. The operating agreement does have an arbitration provision, a very broad one, which is conceded. The operating agreement also revokes all prior agreements. See, you can't have it both ways. It's either arbitrable because the operating agreement has an arbitration provision, or if so, it's been revoked by paragraph 20 of that same agreement. There is no other agreement on which to hang that award. That's not a question of the arbitrator making a mistake or not interpreting the contract the way we like or the way even the court might in hindsight think is right. It's ignoring that operating agreement. And West End has not shown where that entitlement is anywhere in that operating agreement, just like it has not shown anything about res judicata. Why can't Cooper go to the office and speak to the clients and speak to the accountant? Because he's been expelled for cause, they say. That's the central focus of that claim. I see I'm out of time, Your Honor. All right. Thank you, Mr. Lofgren. We appreciate your advocacy as well, the briefing on this case. Mr. Lapidus, likewise, in presenting the case. This concludes the argued cases and concludes the oral argument session with this panel. The argued case along with the non-argued will be submitted, and we'll decide them in due course. Otherwise, we stand adjourned. Thank you, Your Honor.